**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| 6315 MAGAZINE, L.L.C. | § | |
| | § | CIVIL ACTION NO. |
| Plaintiff | § | |
| | § | SECTION: |
| v. | § | |
| | § | JUDGE: |
| FLOT NOLA, L.L.C., BUOYANCE, INC. THE FLOAT CONFERENCE, L.L.C., RESET, L.L.C., INTERNATIONAL THERAPEUTIC FLOATATION CONFERENCE, L.L.C., CECIL ROEBUCK, AND LYDIA BREIGHNER | § § § § § § | MAGISTRATE JUDGE: |
| | § | |
| Defendants | § | |

## COMPLAINT

Plaintiff, 6315 Magazine, LLC ("Plaintiff"), alleges as follows, upon knowledge as to its acts and, as to all other matters, upon information and belief:

## INTRODUCTION

1. Beginning in the middle of 2017, if not earlier, Defendants engaged in a fraudulent business scheme designed to induce Plaintiff and others to provide them with funds, goods and services, ostensibly for use in float therapy spa facilities, but that Defendants Roebuck and Breighner always intended to divert to their own personal benefit and enrichment.

2. Defendants Roebuck and Breighner created a marketing scam, holding themselves out as experts in the health and wellness field, especially involving physical therapy delivered with various types of water and float methods. They engaged in a clever scheme, centered on the

operation of float therapy spas, designed to extract money from third parties through the use of misrepresented facts, exaggerated claims and projections, undisclosed material facts, and false promotions. They created Defendant Buoyance, Inc. a float therapy spa in North Carolina, Defendant Flot Nola, L.L.C., a similar activity in New Orleans, Louisiana, and Defendants, RESET, L.L.C., The Float Conference, L.L.C. and International Therapeutic Floatation Conference, L.L.C. All of these were marketing scams with a deceptive business plan wrapped up in glossy packages, but resting on false promises.

**A. The Flot Nola Scheme:**

3. In September 2018, Defendant, Flot Nola, L.L.C. ("Flot Nola") fraudulently induced Plaintiff to enter into a "Triple Net Lease" (the "Lease") for the lease of premises located at 6024 Magazine St., New Orleans, Louisiana. The Lease obligated Defendant Flot Nola to build out the leased premises as a first-class public float therapy facility and Plaintiff advanced, pursuant to the terms of the lease, $104,000.00 in a cash build-out allowance to Defendant Flot Nola for that purpose.

4. Despite the trust Plaintiff placed in Defendants Flot Nola, Roebuck and Breighner, and despite their express representations, Defendants Roebuck and Breighner always intended to – and did (acting together) – redirect the funds – supposedly designated for the rehabilitation of the specific leased property – to their personal benefit and enrichment, including maintaining a luxury home in New Orleans, Louisiana. In so doing, Defendants abused Plaintiffs' trust by misuse of the funds provided by the Plaintiff.

5. The Lease commenced on October 1, 2018 and was to expire on December 31, 2028. From the Lease's inception, Defendant Flot Nola began a pattern of violating the Lease provisions.

Defendants Roebuck and Breighner signed the Lease on behalf of Flot Nola in their capacity as Flot Nola's Vice President and President, respectively. Additionally, the Lease was personally guaranteed by Defendants Roebuck and Breighner.

6. Defendants, Flot Nola, Roebuck and Breighner, jointly committed fraud and misrepresentation, in part by misappropriating the funds belonging to 6315 Magazine, L.L.C., that, according to the Lease, were to be used by Defendants for the build out of the premises. Additionally, through the intentional misrepresentation of facts and providing fraudulent documents by email, Defendants, Flot Nola, Roebuck and Breighner, induced Plaintiff to enter into the Lease and, subsequently prevented Plaintiff's termination of the Lease while Defendants continued to divert the funds of Flot Nola into accounts of Defendants Roebuck, Breighner, RESET, International Therapeutic Floatation Conference and The Float Conference.

7. As part of the application for the Lease, Defendants Roebuck and Breighner, acting individually and on behalf of Flot Nola, submitted a business plan containing several misstatements and/or false statements of fact. (Exhibit 1)

8. That business plan indicates that Defendant Roebuck, holds several degrees, including a Master's Degree and Ph.D, all indicating his special ability and background to develop and administer the purported float therapy business. Upon information and belief, the degrees earned by Defendant Roebuck were falsely stated. Upon information and belief, Defendant Roebuck holds neither a Masters Degree nor a Ph.D. Further, based on information recently received, it is also doubtful that Defendant Roebuck, holds even a Bachelor of Science degree. Upon information and belief, Defendant Roebuck, appears to have no university degrees at all.

9. In addition, Defendant Flot Nola, provided, by email, false and misleading financial

information to Plaintiff. (Exhibit 2). Specifically, as part of the application for the Lease, Defendant Flot Nola misrepresented that it had $125,000 cash on hand with which to fund its business venture. Upon information and belief, the amount on hand at the time of the application was actually approximately $25,000 because $100,000 of Defendant Flot Nola's funds had already been spent to purchase a private home for Defendants Roebuck and Breighner. In addition to falsely showing $100,000 in cash, which did not exist, Defendants Roebuck and Breighner also listed $100,000 in equity in the home as an asset, thereby misrepresenting their net worth by listing the same $100,000 value twice.

10. Upon information and belief, the new venture, Defendant Flot Nola, was woefully underfunded and undercapitalized. To the degree its rent was paid at all, funding came from Defendant Buoyance and/or Breighner. Defendant Flot Nola, along with Defendants Roebuck and Breighner, improperly used the build out funds provided by Plaintiff pursuant to the terms of the Lease to fund other aspects of the spa therapy ventures and/or to pay Defendant's living expenses.

11. The misuse of the build out funds is, upon information and belief, a part of a continuing fraudulent scheme to bilk Plaintiff and others in order to support a scam business centered upon the solicitation of subscriptions and memberships for floatation therapy spas and conferences that are essentially dysfunctional and/or non-existent. (Exhibit 3)

12. Although Defendant Flot Nola claimed to be open for business during the time period covered by these matters, the door was seen to be kept locked, and it appeared there were no employees present during regular business hours. During regular business hours, potential customers were seen walking up to the business, finding the door locked. It did not appear the

business had been opened on a regular basis, indicating that no attempt was being made to conduct a going business. Upon information and belief some percentage of the spa services were sold through Groupon, with services scheduled on line and paid by credit card in advance. When customers arrived for the scheduled appointment, the door was locked, the appointment missed, and the prepaid funds forfeited.

**B. The Buoyance Scheme**

13. Defendants Roebuck and Breighner actually initiated this flotation spa business activity as early as 2007, in Virginia under the name Euphoric Composure. Euphoric was sold in 2010, for $50,000 in cash and owner financed debt. After several months, Defendants, Roebuck and Breighner were able to default the purchasers and repossessed the Euphoric equipment. Defendant Buoyance, Inc. was then opened in North Carolina in 2011. On or about January 31, 2018, Defendants Roebuck and Breighner sold the assets of Defendant Buoyance. Pursuant to that sale, Defendants Roebuck and Breighner sold all of Defendant Buoyance's assets, including spa equipment, client lists, current memberships, and other related assets necessary to operate a flotation therapy spa. Defendants Roebuck and Breighner, as part of that sale claimed Buoyance's assets were of substantial value, and included physical assets, a client list containing clients who had memberships to the flotation spa, as well as goodwill.

14. They also repeatedly represented that the business was in good financial health and that its assets had certain values and explicitly represented that certain equipment had a certain dollar value, and that the business had considerable goodwill, which was also assigned a dollar value. Specifically, Defendants presented the purchasers with a "Confidential Memorandum" in which Defendants represented, *inter alia*, that Buoyance had annual gross revenue of $208,000,

that the book value of the assets to be conveyed was $307,000, and that the client list was worth $15,000. (Exhibit 4)

15. Upon information and belief, as set forth in greater detail below, these representations were false, and Defendants Buoyance, Roebuck and Breighner knew them to be false at the time they made the representations.

16. Defendants Roebuck and Breighner incorporated Defendant Flot Nola in Louisiana on February 1, 2018, the day following their sale of the assets of Defendant Buoyance. After purchasing the assets and goodwill of Defendant Buoyance, the new owners began attempting operation as a flotation therapy center, providing wellness services to clients, including but not limited to halo therapy, floatation therapy, massage therapy, and other therapy and wellness services and products from the location previously occupied by Defendant Buoyance. As 2018 progressed, the new owners began to uncover that Defendants Buoyance, Roebuck and Breighner had completely misrepresented the business and assets that had been sold.

17. Among other things, Defendants misrepresented recurring revenue. Many monthly memberships had been cancelled causing the new owners to refund amounts related to these memberships. Undisclosed internet sales were also found and the new owners had to perform services related to those internet sales, even though Defendant Buoyance held the membership payments. Prior to the sale, Defendants Buoyance, Roebuck and Breighner actively concealed the true fact that the flotation spa had no substantial continuing business or value.

18. Defendants, Roebuck and Breighner, having created Defendant Flot Nola in New Orleans on the day after they sold the assets of Defendant Buoyance in North Carolina, commenced to actively continue their scheme by selling memberships and prepaid spa services in a

dysfunctional or non-existent float therapy spa in New Orleans, ultimately entering into the Lease with Plaintiff, ostensibly to create that float therapy spa in the leased premises.

**C. The Therapeutic Conference Scheme:**

19. During this entire period, beginning at least by mid-2018, Defendants Roebuck and Breighner created and advertised at least two false therapeutic conferences, Defendant The Float Conference, L.L.C. in 2018, and Defendant Therapeutic Floatation Conference, L.L.C. in 2019. (See Exhibit 3). Each of these proposed conference entities solicited and received services and money from various venues, suppliers, and public subscribers, using both mail and internet solicitations. No such conferences were ever held and the solicitated funds were diverted to the use and benefit of Defendants Roebuck and Breighner.

**D. The Granoff Trust Scheme**

20. During 2018, or shortly thereafter, Defendant Flot Nola borrowed approximately $160,000 from the Granoff Trust in Florida, with two separate loans in that approximate amount, securing repayment with:

i). the income from the note that Defendant Roebuck had received from the sale of the assets of Defendant Buoyance.

ii). a pledge of various physical assets of Flot Nola located within the business premises of 6024 Magazine Street and which were either fixed assets that were the property of Plaintiff or assets already pledged to various other vendors of Defndant Flot Nola.

The proceeds of the loan, upon information and belief, actually were deposited into the bank account of Defendant Breighner. No repayment has ever been made to the Granoff Trust.

21. As a result of Defendants' fraudulent business activities and schemes, Defendants are liable for a pattern of racketeering in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §1962(c), and conspiring to violate RICO, 18 U.S.C. §1962(d). They are also liable to Plaintiff for fraud, breach of contract, conversion, libel and harassment, breach of the consent judgment, damages and attorney's fees.

22. Defendants' violations, tortious activities, and contract breaches, which began as early as 2017, are continuing and have caused at least $1,500,000 in damages to Plaintiff.

**JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States; 28 U.S.C. § 1332, and because Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. This Court also has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367, because those claims are substantially related to Plaintiffs' claims under federal law.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants resides in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

25. Plaintiff 6315 Magazine, L.L.C. ("Magazine" or "Plaintiff"), is a Louisiana Limited Liability Company with a place of business located at 511 Calhoun Street, New Orleans, LA.

26. Plaintiff Magazine owns the real property located at 6024 Magazine St., New Orleans, LA.

27. Defendant Flot Nola, L.L.C. ("Flot Nola") is a Louisiana Limited Liability Company with a place of business at 6123 Charlotte Dr., New Orleans, LA 70122.

28. Defendant Cecil Roebuck ("Roebuck") is a person of full age of majority, and a domiciliary of Orleans Parish, LA., with a residence at 6123 Charlotte Dr., New Orleans, LA 70122.

29. Defendant Lydia Breighner ("Breighner") is a person of full age of majority, and a domiciliary of Orleans Parish, LA., with a residence at 6123 Charlotte Dr., New Orleans, LA.

30. Defendant Buoyance, Inc. ("Buoyance") is a North Carolina corporation, with articles of incorporation dated January 24, 2011. Defendant Breighner is its registered agent.

31. Defendant The Float Conference, L.L.C. is a Louisiana limited liability company, registered on August 31, 2017. Defendant Breighner is its registered agent.

32. Defendant RESET L.L.C. is a Louisiana limited liability company registered on May 7, 2019. Defendant Breighner is its registered agent.

33. Defendant International Therapeutic Floatation Conference, L.L.C. is a Louisiana limited liability company registered on June 4, 2019. Defendant Breighner is its registered agent.

**FACTUAL ALLEGATIONS**

34. On or about September 13, 2018, Plaintiff and Defendants, Roebuck and Breighner and Defendant Flot Nola, entered into a Lease of the premises located at 6024 Magazine Street, New Orleans, Louisiana, 70115 ("the Lease"). (Exhibit 5).

35. Defendants Roebuck and Breighner signed the Lease on behalf of Defendant Flot Nola in their capacity as Defendant Flot Nola's Vice President and President, respectively. Additionally, the Lease was personally guaranteed by Defendants Roebuck and Breighner,

individually. (Exhibit 6)

36. The Lease commenced on October 1, 2018 and was to expire on December 31, 2028. From the Lease's inception, Defendants Flot Nola, Roebuck and Breighner began a pattern of violating the Lease provisions.

37. Defendants, Flot Nola, Roebuck and Breighner, jointly committed fraud and misrepresentation, by misappropriating funds provided by Plaintiff, which, according to the Lease, were to be used by Defendants for the build out of the premises.

38. Defendant Flot Nola, repeatedly breached the Lease in the following respects:

- Failure to timely pay the rent
- Failure to pay the late fees associated with the past due rent
- Failure to pay property taxes due under the Lease
- Failure to comply with the method of payment set forth in the Lease
- Failure to pay insurance premiums due under the Lease
- Failure to maintain the premises
- Failure to prevent liens from being placed on the property
- Failure to provide commercial insurance covering the property
- Failure to acquire the appropriate licenses and permits

39. Due to the above breaches, Plaintiff filed suit on numerous occasions seeking to evict Defendant Flot Nola from the premises.

40. Finally, on March 2, 2020, a trial was held regarding Plaintiff's third (3rd) filed suit to evict Defendant Flot Nola. On March 16, 2020, Plaintiff's Petition for Eviction was granted and Defendant Flot Nola was required to vacate the leased premises.

41. Before vacating, Defendants Roebuck and Breighner, jointly, plundered the property, looted immovable fixtures from the property, and caused damage to the premises.

42. The property being leased had been a gutted property ready for build out. As part of the Lease transaction, Plaintiff agreed to pay $104,000.00 for the build out and agreed to allow

Defendant Flot Nola to perform the build out of the property.

43. In compliance with the Lease transaction, Plaintiff paid the full amount of the agreed upon $104,000.

44. Upon information and belief, Defendant Flot Nola failed to use the $104,000 to build out the property. Upon information and belief Defendant Flot Nola failed to use at least $70,000 of the $104,000 build out funds to actually build out the property, as at least that amount remains unpaid to subcontractors who performed work at the subject property. (Attached as Exhibit 7 is a schedule of unpaid, or underpaid, contractors and supplies.)

45. Upon information and belief, Plaintiff asserts that Flot Nola was underfunded and undercapitalized and that Defendants Flot Nola, Roebuck and Breighner improperly used the build out funds to fund other aspects of the venture and/or pay Defendants' Roebuck and Breighner's living expenses while waiting for the business to make a profit, all of which was a fraudulent misuse of the funds. Plaintiff asserts that the intentional misuse of build out funds, which funds were to be used to pay for the build out, is fraud insofar as the truth of the use of the funds was suppressed and/or misrepresented by Defendants Flot Nola, Roebuck, Breighner, and RESET for the sole purpose of obtaining an unjust advantage – keeping and/or using funds that did not belong to them.

46. On March 16, 2020, Defendant Flot Nola was evicted from the leased premises. Plaintiff is also entitled to all remedies available to it under the Lease including the acceleration of rents due to it under the remaining eight and one-half (8½) years of the Lease or liquidated damages in a sum equal to six months' rent as provided for in the Lease.

47. Before final eviction from the premises, Defendants Roebuck and Breighner spent

a weekend, while Courts were not open, intentionally plundering the property, looting immovable fixtures such as doorknobs, air conditioning equipment, doors, installed appliances and other installed fixtures. (See list attached as Exhibit 8).

48. Pursuant to Louisiana Civil Code article 2424 (A), Defendants are solidarily liable for these "intentional and willful" acts. Defendants conspired with, and acted in concert with one another to plunder and loot the leased premises to specifically cause harm to Plaintiff.

49. On March 25, 2020, Defendant Roebuck contacted by mail and/or email, a creditor of Defendant Flot Nola, RTW Construction, LLC (RTW) and attempted to entice, and deceive, that creditor into filing an illegal lien on the leased property. (See attached email, "Text to your assistant" as Exhibit 9).

50. RTW had a lien for unpaid construction work on the Lease site and Defendant Roebuck, on behalf of Defendant Flot Nola, had entered into a payment plan with RTW in order to help Defendant Flot Nola avoid eviction by Plaintiff.

51. Defendant Flot Nola and Defendant Roebuck mislead RTW until the worker's lien statutory period ended and then failed to make further payments leading to a bounced balloon payment to RTW on June 1, 2019. A lien was then paid in 2019. A check written by Defendant Flot Nola to clear that lien then bounced on March 2, 2020.

52. Defendant Roebuck knew, or should have known, that Plaintiff had no contractual relationship with RTW Construction and that the period to place a lien on the formerly leased property had lapsed. The effort to entice RTW to place an unlawful lien constitutes harassment directed at Plaintiff and Defendant Roebuck's unsolicited email contains falsehoods and mischaracterizations designed to impugn the reputation of Anthony Zelenka, the principal of

Plaintiff.

53. Defendant Buoyance had operated as a flotation therapy spa from its location in Huntersville, North Carolina from and after at least 2014.

54. On or about January 31, 2018, Defendants Buoyance, Roebuck and Breighner entered into an Asset Purchase Agreement (the "Agreement") and a Bill of Sale and Blanket Assignment (the "Bill of Sale") and sold the assets of Buoyance. (Exhibits 10 and 11, respectively).

55. Pursuant to the Agreement, Defendants Roebuck and Breighner sold all of Defendant Buoyance's assets, including spa equipment, client lists, current memberships, and other related assets necessary to operate a flotation therapy spa, and vacated the location from which Buoyance had been providing services.

56. Defendant Roebuck signed the Agreement on behalf of Defendant Buoyance.

57. In the Agreement, and in the representations made by Defendants Buoyance, Roebuck and Breighner, these Defendants claimed Buoyance's assets were of substantial value, including physical assets, a client list containing clients who had memberships to the floatation spa, and goodwill.

58. Defendants Buoyance, Roebuck and Breighner also repeatedly represented that the spa therapy business was in good financial health and that its assets had certain values. They specifically represented that there were no "undisclosed liabilities" beyond those specifically referenced in the Agreement.

59. Defendants Buoyance, Roebuck and Breighner further explicitly represented that certain equipment had a certain dollar value, and that the business had considerable goodwill,

which was also assigned a dollar value. Specifically, they presented, by mail and email, a "Confidential Memorandum" (Exhibit 4) to the buyers in which they represented, *inter alia*, that Defendant Buoyance's business had annual gross revenue of $208,000, that the book value of the assets to be conveyed was $307,000, and that the client list was worth $15,000.

60. Upon information and belief, these representations were false, and Defendants Buoyance, Roebuck and Breighner knew them to be false at the time they made the representations.

61. Once buyers purchased the assets and goodwill of Defendant Buoyance, they began operating as a floatation therapy center, providing wellness services to clients, including but not limited to halo therapy, floatation therapy, massage therapy, and other therapy and wellness services and products from the location previously occupied by Defendant Buoyance.

62. They then began to uncover that Defendants Buoyance, Roebuck and Breighner had misrepresented the business and assets, portraying the value of the business well above its actual value.

63. Among other things, Defendants Buoyance, Roebuck and Breighner misrepresented the number of monthly memberships (i.e. recurring revenue). Many monthly memberships had been cancelled, causing the buyers to refund fees to those clients. Prior to signing the Agreement and throughout the due diligence period, Defendants Buoyance, Roebuck and Breighner actively concealed the true nature of the business and its assets, including the number of active memberships.

64. Defendants Buoyance, Roebuck and Breighner concealed and/or misrepresented the value of equipment by misrepresenting and/or concealing the debts on assets. Contrary to promises made in the Agreement that there were no "undisclosed liabilities," certain assets had

outstanding debt on them and certain account payables, such as for credit card processing, were in default. Certain assets were also considered out-of-warranty and not eligible for repair through the warranty. Both in the Agreement and during the due diligence period, Defendants Buoyance, Roebuck and Breighner repeatedly and falsely represented to the buyers that there was no debt on certain assets that, in fact, carried debt.

65. Buyers were also informed by regulatory authorities in early 2018 that one of the treatment rooms and the equipment therein was not (and had never been) compliant with local health codes, and could not lawfully be used for its intended purpose. While it is unclear what the cost of remediation will be, upon information and belief, the cost to the buyers will be substantial. Moreover, with respect to Flot Nola, Plaintiff learned that Defendants Roebuck and Breighner failed to properly wire the float pumps and failed to properly perform other electrical work, which could have resulted in serious risk of harm to individuals using the float tanks. Upon information and belief, Cecil Roebuck and his brother performed the electrical work, not a licensed professional. (Exhibit 12)

66. Defendants Buoyance, Roebuck and Breighner also breached representations contained in the Agreement which stated in part … "The financial statements, income tax filings, and accounts reflect the actual activity in Seller's business for the period covered by the financial statements, and full and accurate copies of all revenue statements have been provided to buyer." (See Exhibit 10, Sec. 2.11).

67. Upon information and belief, Defendant Buoyance's financial statements and income tax filings were false and falsified and Defendant Buoyance submitted false and falsified tax documents to the Internal Revenue Service.

68. In addition, Defendant Buoyance repeatedly breached the Agreement with the buyers by refusing to transfer and assign to buyers the lease for the premises where Defendant Buoyance had operated its business. This conduct was a flagrant violation of the Agreement, which states "[s]eller shall reasonably cooperate with any request to assign the lease to Buyer..." (See Exhibit 10, Sec. 1.1.6).

69. Defendant Roebuck wrongfully and tortiously interfered with the Agreement by preventing Defendant Buoyance from transferring that lease to the buyers.

70. Defendants Buoyance, Roebuck and Breighner refused to cooperate, and became belligerent in their refusal to cooperate, with the assignment of the lease to buyers. In fact, Defendants Roebuck and Breighner threatened buyers that they would not transfer the lease – thereby breaching the Agreement – because Defendant Roebuck wanted to retain the ability to "shut down" the buyer's business at any time he chose.

71. Among other things, Defendant Roebuck responded to the buyer's request with a text message that "we can get your name only on the lease as soon as I am paid off in full." (See Exhibit 13). As this text message evidences, Defendant Roebuck breached the Asset Sale Agreement, and Defendant Roebuck tortiously interfered with that Agreement, by refusing to cooperate in the transfer of the lease as required by the Asset Sale Agreement, until certain conditions, that Defendant Roebuck had no right to insist upon, were met.

72. By virtue of Defendant Buoyance's failure to disclose all liabilities, false representations, refusal to reasonably cooperate with the transfer of the lease, and other related conduct, Defendants Buoyance, Roebuck and Breighner breached the Asset Sale Agreement.

73. On or about May 16, 2019, Defendant Roebuck arrived at the seller's location and

handed a letter to the buyer's Chief Marketing Officer, Tyler Johnson, and ordered Mr. Johnson to remove himself and all employees from the building, even though they were in the middle of providing client services. (See Exhibit 14). Defendant Roebuck's justification for this order was that, because Defendant Buoyance was still the tenant on the lease of the property (by virtue of his and its breach of the Agreement), Defendant Roebuck had the right to evict buyer from the business location.

74. Defendant Roebuck falsely claimed that a payment of approximately $5,000 was a few days late and that gave him the right to seize all of buyer's assets, evict buyer from its business location, and destroy buyer's business. Notably, the payment was not late – it was sent by certified mail on April 26, 2019, well before the date it was due, with tracking information provided to Defendant Roebuck. Nevertheless Mr. Johnson complied with Roebuck's unlawful demand and removed everyone, including the clients, from the building.

75. Defendant Roebuck then had the locks changed, the security system administration put in his name, and placed signs on the window stating that the business was closed and directing Buyer's clients and/or potential clients to call his cell phone for information.

76. Defendant Roebuck also unlawfully seized and converted certain personal property from the buyer's business and took that property with him to Louisiana.

77. Upon information and belief, Defendants Buoyance, Roebuck and Breighner have since acknowledged that they have no right to the personal property (which they now claim they took to "preserve" the property).

78. Defendant Roebuck's conduct in attempting to engineer a default, in taking control over buyer's property, and in depriving buyer access to its business location was a malicious and

calculated effort to destroy buyer's business and steal its assets. To make matters worse, Defendants put up signs in the business notifying buyer's customers that the business is "closed" and instructing buyer's customers to contact Defendant Roebuck with any questions about the closure. These actions have and will continue to damage buyer's relationships with its customers and has caused irreparable harm to buyer's business.

79. Upon information and belief, Defendant Roebuck controlled the conduct of Defendant Buoyance with respect to the actions and inactions complained of in this pleading to such an extent that Defendant Buoyance had no separate mind, will, or existence of its own.

80. Specifically, upon information and belief:

a. Defendant Buoyance was inadequately capitalized;

b. Defendant Buoyance failed to comply with corporate formalities;

c. Defendant Roebuck completely dominated and controlled Defendant Buoyance so that it had no independent identity; and

d. Defendant Buoyance was not properly maintaining ordinary and necessary company records.

81. Defendant Roebuck used his control over Defendant Buoyance to act in furtherance of Defendants Roebuck and Breighner's overall conspiracy.

**FIRST CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(against Defendant Roebuck)**

82. Plaintiff incorporates by reference all preceding paragraphs.

83. Plaintiff is a person as defined in 18 U.S.C. § 1961(3) and 1964(c).

84. Defendant Roebuck is a person as defined in 18 U.S.C. § 1961 (3) and 1964(c).

## I. The Applicable Statutes

85. Under 18 U.S.C. § 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection or unlawful debt." And, under 18 U.S.C. § 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions, including Section 1962(c).

86. Federal RICO, specifically 18 U.S.C. § 1964(c), creates a private right of action for any person injured in his business or property by reason of violation of § 1962 and provides for threefold the damages sustained as a result of recovery and for the cost of suit including reasonable attorney fees.

## II. The Enterprise

87. The Enterprise is an association in fact consisting of an individual (Roebuck) along with the legal entities he is the owner of, including Buoyance, Inc. and Flot Nola, LLC, The Float Conference, LLC and International Therapeutic Floatation Conference, L.L.C. Roebuck and the legal entities he controlled constitute an "Enterprise" as described in 18 U.S.C. § 1961(4), which functioned for the purpose of defrauding Plaintiff (and others) and enriching the Enterprise's members and associates (Defendants Breighner, RESET and others) through falsely claiming that funds provided by Plaintiff would be used to initiate, develop and enhance a floatation spa business, but instead were used for Roebuck's personal enrichment.

88. As the owner of the legal entities associated in fact with Roebuck, Roebuck conducted and participated in the operation of the Enterprise. The Enterprise operated as an

ongoing organization separate and distinct from Defendant Roebuck. The Enterprise, an association in fact of an individual and legal entities, has a structure separate and apart from the pattern of racketeering activity in which Defendant Roebuck engaged.

89. At all times relevant to this Complaint, members and associates of the Enterprise, an association in fact enterprise, functioned together as a continuing unit, with a common purpose for the economic benefit and gain of the RICO Defendant Roebuck, who participated in the management and operation of the Enterprise, as further described below. The Enterprise had longevity sufficient to permit RICO Defendant Roebuck to pursue the Enterprise's purpose.

90. The activities of the Enterprise affected interstate commerce as it provided services to clients, at least some of whom, are located in other states and is a business which used goods and services which travel in interstate commerce. The Enterprise also affected interstate commerce based on Defendant's unlawfully obtaining, transmitting, billing and collecting monies through use of interstate wirings, in furtherance of the racketeering scheme as alleged in the Complaint.

## III. The Racketeering Violation

91. From on or about the end of 2017, and continuing through the date of the filing of this Complaint, the RICO Defendant Roebuck, a person associated with or employed by the Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in each Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962(c).

92. Defendant has engaged in a pattern of racketeering activity by committing at least two acts of racketeering activity after the effective date of RICO and also within 10 years of each

individual act. Defendant's actions also violated the federal wire fraud statute 18 U.S.C. § 1343, a predicate act for purpose of racketeering.

**IV. Racketeering Activity**

93. Over the course of years, the RICO Defendant Roebuck knowingly and intentionally engaged in an ongoing pattern of racketeering activity under 18 U.S. Code § 1962(c) by committing the predicate acts of mail and wire fraud as set forth herein. The fraudulent schemes involved using the interstate mail and wires to defraud Plaintiff of more than a million dollars.

94. In furtherance of this scheme to defraud, and with the purpose of executing his scheme to defraud, Defendant Roebuck, made intentional misrepresentations and omissions which include, but are not limited to, the following:

- During 2018, Defendant Buoyance made continuous solicitations by mail for memberships and subscriptions to its purported therapeutic spa locations advertising therapeutic flotation services that were substandard, administered by unqualified therapists and conducted in facilities that did not meet legal code and hygiene requirements.
- In the fall of 2018, Defendant Buoyance provided by email false business and financial information to the ultimate purchasers of its assets.
- In December 2018, Buoyance misrepresented to the purchasers of its assets that it intended to, and would, use the funds to, among other things, enhance the overall reputation of the flotation therapy business by funding and staging the float conferences, an effort and undertaking that proved to be entirely false.

- Buoyance misrepresented to its purchasers that it intended to, and would transfer its leased facility to them as the new owners, which it failed to do, making it impossible for them to continue operating the spa facility.

95. In furtherance of their scheme to defraud, and with the purpose of executing his scheme to defraud, Defendants herein, used mail and email to defraud Plaintiff of hundreds of thousands of dollars. These activities consist of electronic messages which constitute interstate transmissions, and the transfer of monies in the interstate banking system between Defendant, Flot Nola, RESET, Roebuck and Breighner, caused by Defendant Roebuck, all in furtherance of the scheme to defraud, and are in violation of 18 U.S.C. Section 1343, which is predicate activity.

**V. Pattern of Racketeering Activity**

96. Plaintiff alleges that the course of conduct engaged in by the RICO defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiff can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission, or are related to the affairs of the Enterprise." All predicate acts had the same purpose of defrauding Plaintiff of more than a million dollars, all for the personal enrichment of Defendant Roebuck and his associated legal entities.

97. Plaintiff alleges that the continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period of time, i.e., from about mid 2017 through January 2020, and its continuing at the present time.

98. Plaintiff alleges that the pattern of racketeering activity is shown to be a threat of continued activity, as Defendant Roebuck and his associated legal entities have repeatedly engaged

in the illegal and illicit activities. Thus, engaging in the pattern of racketeering as set forth herein is the regular way Defendant Roebuck conducted the affairs of his associated legal entities. Because the Enterprise has been ongoing since at least 2007, and because Roebuck continues to fraudulently undertake additional spa therapy schemes, the cycle of deception and fraud will continue well into the future if not stopped. Thus, Roebuck, his associated legal entities and their fraudulent activities remain a threat to others, and their racketeering activity meets the open-ended continuity test.

## VI. Injury

99. As a direct and proximate result of the Defendants' predicate acts in furtherance of violating 18 U.S.C. § 1962(c), Plaintiff has been and is continuing to be injured in its business or property in the amount of at least $1,500,000.

## SECOND CAUSE OF ACTION
## (Federal Civil RICO Conspiracy – 18 U.S.C. § 1962(d))
## (Against Defendants)

100. Plaintiff repeats each of the allegations contained in Paragraphs 1 through 99 as if set forth herein at length.

**The Conspiracy Violation**

101. Plaintiff alleges that commencing in early 2018, and continuing until the present, the RICO Defendant described above, i.e., Roebuck, conspired to violate section 1962(c), i.e., he agreed that a co-conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering, consisting of acts indictable under 18 U.S.C. §§ 1343, as more fully described in the First Cause of Action. Plaintiff alleges that the conspiratorial objective of that

mutual agreement was intended to obtain Plaintiff's interests in business and/or property, and that such conspiratorial conduct violates RICO § 1962(d).

102. RICO Defendant Roebuck intended to further the schemes to defraud, which as described in the First Cause of Action were completed and satisfied by Defendant Roebuck, the substantive individual Defendant. As demonstrated in detail above, the Defendant has engaged in numerous predicate racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud Plaintiff of money and other property interests.

103. The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of an 18 U.S.C. §1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but was aware that his ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

**STATE LAW CAUSES OF ACTION**

104. The allegations of paragraphs 1 through 103 are incorporated herein by reference.

**THIRD CAUSE OF ACTION**

**FRAUD**

105. The property being leased was a gutted property ready for build out. As part of the Lease transaction, 6315 Magazine, L.L.C., agreed to pay One Hundred Four Thousand and No/100 Dollars ($104.000.00) for the build out and agreed to allow Defendants to perform the build out of the property.

106. In compliance with the Lease transaction, 6315 Magazine, L.L.C. paid the full amount of the agreed upon $104,000.00, which Defendants were to use to build out the property.

107. Upon information and belief, Defendants failed to use all the $104,000.00 to build out the property.

108. Upon information and belief, Defendants failed to use at least $70,000.00 of the $104,000.00 build out funds to actually build out the property, as at least $70,000.00 was not paid to subcontractors who performed work for the build out and those subcontractors are still due to be paid. (Exhibit 7)

109. Upon information and belief, Defendants misappropriated funds from the $104,000.00 by failing to use the funds on the build out as agreed. 6315 Magazine, L.L.C. believed, based upon the contracts at issue, and the representations of Defendants, that all of the $104,000.00 would be used on the build out of the property.

110. Upon information and belief, 6315 Magazine, L.L.C. asserts that Flot Nola was underfunded and undercapitalized and that Defendants improperly used the build out funds to fund other aspects of the venture and/or pay Defendants' living expenses while waiting for the business to make a profit, all of which are a fraudulent misuse of the funds.

111. 6315 Magazine, L.L.C. asserts that the intentional misuse of build out funds, which were to be used to pay for the build out, is fraud insofar as the truth of the use of the funds was suppressed and/or mispresented by Defendants for the sole purpose of obtaining an unjust advantage – keeping and/or using funds that did not belong to them.

**FOURTH CAUSE OF ACTION**

**BREACH OF THE LEASE**

112. The Lease, at Pages 2, paragraph 7, states in part:

> PROPERTY TAXES: Lessor will, in a timely manner, pay all ad valorem property taxes levied on the Property, and upon such payment

> shall submit to the Lessee a copy of the tax bill (s) within 5 business days from payment thereof. Lessee shall reimburse Lessor for the pro-rated amount of the ad valorem property taxes as evidenced by delivery of evidenced payment of the tax bill within 10 business days of receipt of the evidenced payment of the ad valorem property tax bill.

113. Pursuant to the Lease, 6315 Magazine, L.L.C. paid all ad valorem property tax levied on the property and timely sent Flot Nola the required notifications. Flot Nola failed to reimburse 6315 Magazine for the ad valorem taxes.

114. Pursuant to the Lease, 6315 Magazine, L.L.C. asserts that it is entitled to and seeks reimbursement for the ad valorem taxes it paid on the property.

115. The Lease, at Page 3, paragraph 8, states in part:

> INSURANCE: Lessor shall continue to carry and pay in full all cost of public liability, fire, windstorm and extended coverage insurance premiums respecting insurance coverage of the Property; and upon such payment shall submit to the Lessee a copy of the evidenced payment of the insurance premiums within 10 business days from payment thereof. Lessee shall reimburse Lessor for the full amount of all insurance expenses related to the Property as evidence by the payment of the insurance premiums within 10 business days of receipt of the evidenced payment of the insurance premiums.

116. Pursuant to the Lease, 6315 Magazine, L.L.C. paid all insurance premiums on the property and timely sent Flot Nola the required notifications. Flot Nola failed to reimburse 6315 Magazine for the insurance premiums.

117. Pursuant to the Lease, 6315 Magazine, L.L.C. asserts that it is entitled to and seeks reimbursement for the insurance premiums it paid on the property.

118. The Lease, at Page 1, paragraph 3, outlines Flot Nola's obligations for rental payments. Beginning with the fourth month of the lease, Flot Nola was to pay $5,416.67 on or

before the first of each month. Additionally, a 10% late fee is owed if the rent is not paid five days after the due date.

119. Flot Nola, L.L.C. has failed to pay the rents due in the amount of $5,416.67, plus the applicable late fee of $541.67.

120. Pursuant to the Lease, 6315 Magazine, L.L.C. asserts that it is entitled to and seeks rental payments and penalties from Flot Nola, L.L.C. for the month of March of 2020 in the amount of $5,958.34.

121. The Lease, at Page 7, paragraph 15, states that the Lessee will, at Lessee's sole expense, keep and maintain the entire Leased Premises in good repair. This includes, without limitation, the exterior yard areas, the landscaping, interior walls, floors, ceilings, security lighting, site lighting, mechanical components including the heating and cooling systems, all plumbing and electrical systems, ducts, utilities, and lighting and general upkeep of the interior spaces of the Leased Premises.

122. 6315 Magazine, L.L.C., after inspecting the property, found several issues needing immediate attention. These included ongoing damage to the exterior windows due to improper sealing, failure to maintain the exterior spaces, water damage, overfilled gutters, shingle repair and chimney maintenance. Plaintiff notified Flot Nola, L.L.C., through its attorney, on several occasions regarding the areas of upkeep that needed attention.

123. Getting no response from Flot Nola, 6315 Magazine, L.L.C. proceeded with repairs to address some of the issues.

124. 6315 Magazine, L.L.C. asserts that it is entitled to and seeks damages for the expenses it paid in maintaining the leased premises in good repair.

125. The Lease, at Page 5, paragraph(A)(3) states in part:

> Lessee covenants not to suffer any liens to be filed against the Premises by reason of any work, labor, services, or materials performed at or furnished to the Premises by Lessee, or by anyone acting through or on behalf of Lessee related to the construction of the initial Tenant improvements.

126. Due to Flot Nola's failure to pay the workmen for the construction work completed on the build out, liens were placed on the leased property.

127. 6315 Magazine, L.L.C. asserts that it is entitled to and seeks reimbursement for money it expended in removing any liens from the property due to Flot Nola's construction.

128. The Lease, at Pages 6-7, paragraph 12, states in part:

> LESSEE DEFAULT: In the event . . . or should Lessee fail to comply with any of the other obligations of this lease, within twenty (20) days from the mailing by Lessor of notice demanding same, this lease shall be in default. In the event of any default, Lessor shall have the right at Lessor's option (a) to cancel this lease, in which event there shall be due to lessor as liquidated damages, a sum equal to the amount of the guaranteed rent for 6 months, or; (b) to accelerate the net present value of all rental due for the unexpired remaining term of this lease and declare same immediately due and payable; and/or (c) to sue for the rents in intervals or as the same accrues.

129. Flot Nola, L.L.C. failed to comply with the Lease's obligations and was, therefore, in default of the Lease. After sending notice of default, 6315 Magazine, L.L.C. opted to cancel the lease. 6315 Magazine is entitled to all remedies available to it under the lease including the acceleration of rents due to it under the remaining eight and one-half (8½) years of the lease or, in the alternative, liquidated damages in a sum equal to six months' rent as provided for in the Lease.

**FIFTH CAUSE OF ACTION**

**DAMAGE TO LEASED PROPERTY AND CONVERSION**

130. On March 17, 2020, Flot Nola, L.L.C. was evicted from the leased premises.

131. Before final eviction of the premises, Flot Nola, L.L.C., Cecil Roebuck and Lydia Breighner spent a weekend, while Court was not open, intentionally plundering the property, looting the immovables such as doorknobs, air conditioning equipment, doors, installed appliances and other installed fixtures. (See list attached as Exhibit 8)

132. Defendants conspired and agreed amongst themselves that when vacating the property, they would harm 6315 Magazine, L.L.C. by taking certain immovables and causing other damage to the property before vacating the premises.

133. 6315 Magazine, L.L.C. suffered harm and damages directly resulting from the actions taken by Flot Nola, L.L.C., Roebuck and Breighner outlined herein.

134. Pursuant to Louisiana Civil Code article 2424 (A), Defendants are solidarily liable for these "intentional and willful" acts. Defendants conspired with, and acted in concert with one another to plunder and loot the leased premises to specifically cause harm to 6315 Magazine, L.L.C.

**SIXTH CAUSE OF ACTION**

**LIBEL AND HARRASMENT**

135. On March 25th, 2020; Defendant, Cecil Roebuck contacted a creditor of Flot Nola, LLC, RTW Construction, LLC (RTW) and attempted to entice and deceive that creditor into filing an illegal lien on the property from which he, and his company Flot Nola, LLC. (See attached email, "Text Your Assistant" as Exhibit 9).

136. RTW had previously placed a lien on the property in 2019 and Roebuck, on behalf of Flot Nola, entered a payment plan with RTW to entice them to remove the lien upon the

premises to avoid eviction by 6315 Magazine, LLC.

137. Roebuck mislead RTW beyond the worker's lien period and then failed to make payments on his loan, leading to a bounced balloon payment to RTW in June, 2019.

138. Roebuck knew, or should have known, that 6315 Magazine, LLC has no contractual relationship with RTW Construction and the period to place a lien on the formerly leased property had lapsed. Therefore, his effort to entice RTW to place a lien constitute harassment directed at his former landlord, 6315 Magazine LLC.

139. Furthermore, Roebuck's unsolicited email contains falsehoods and mischaracterization to impugn the reputation of Anthony Zelenka, the principal of 6315 Magazine, LLC in order to solicit harassment against Mr. Zelenka. Roebuck's actions have caused damage to 6315 Magazine, LLC.

**SEVENTH CAUSE OF ACTION**

**BREACH OF CONSENT JUDGMENT AND JOINT STIPULATION**

140. As previously set forth in this Petition, Flot Nola and 6315 Magazine, LLC entered into a Consent Judgment and Joint Stipulation issued on October 29, 2019 (See attached Consent Judgment and Joint Stipulation as Exhibit 15).

141. Pursuant to the Consent Judgment, Flot Nola was required to do the following:

- Remove all planter boxes and all wood in the planter boxes that comes in contact with the ground;
- Remove sheetrock from the windows of the premises; and
- Keep current and maintain all licenses required for any business operated at the premises.
- Have commercial liability insurance in effect as of April 23, 2019.

142. In breach of the Consent Judgment, Flot Nola failed to remove the planter boxes and

wood debris from the premises. As a result, 6315 Magazine, LLC, was forced to remove the planter boxes and debris at a cost of One Thousand Two Hundred Fifty and No/100 Dollars ($1,250.00). Flot Nola also, in breach of the Consent Judgment, failed to remove sheetrock from the windows of the premises.

143. Additionally, in breach of the Consent Judgment, Flot Nola failed to obtain an Occupational License for 2019 from the City of New Orleans.

144. 6315 Magazine, LLC, suffered damages as a result of Flot Nola's breach of the Consent Judgment. 6315 Magazine, LLC, hereby asserts that it is entitled to recover all damages suffered as a result of Flot Nola's breach of the Consent Judgment, including but not limited to costs and expenses in removing the planter boxes and debris at its own expense, as well as all costs, expenses and attorneys' fees incurred by 6315 Magazine, LLC in connection with the legal proceedings which produced the Consent Judgment and Flot Nola's breach thereof.

**EIGHTH CAUSE OF ACTION**

**ATTORNEYS FEES**

145. Page 8, paragraph 17 of the Lease states:

> ATTORNEY'S FEES AND EXPENSES: In the event it becomes necessary for either party to employ an attorney to enforce collection of the rents or property expense reimbursements agreed to be paid, or to enforce compliance with any of the covenants and agreements herein contained, the unsuccessful party shall be liable for reasonable attorney's fees, costs and expenses incurred by the other party.

146. Further, the Lease, at Pages 6-7, paragraph 12, sub-paragraph 3 states:

> In the event Lessee defaults in the performance of any of the items, convents, agreements or conditions contained in this lease and Lessor places the enforcement of this lease, or any part thereof, or the collection of any rent due or to become due hereunder, or recovery of

> the possession of the Leased Premises in the hands of an attorney, or files suit upon same, Lessee agrees to pay reasonable attorney's fees and costs incurred by Lessor.

147. Plaintiff incurred attorney's fees, costs and expenses in evicting Flot Nola, L.L.C from the premises, as well as a result of the multiple violations of Flot Nola, Roebuck and Breighner throughout their occupation of the premises. 6315 Magazine hired attorneys and filed suits to recover possession of the premises on three separate occasions resulting from Flot Nola's breach of the Lease and in connection with enforcement of the Lease as provided in the Lease at Page 8, paragraph 17, and Pages 6-7 paragraph 12.

148. Pursuant to the Lease, 6315 Magazine, L.L.C. asserts that it is entitled to, and therefore seeks, attorney's fees, costs and expenses incurred in connection with the two open eviction proceedings, the open reconventional demand and in the instant matter.

149. The legal fees and expenses for these three proceedings, including the ultimate eviction, total One Hundred Fifty-Seven Thousand Thirty-Seven and 20/100 Dollars ($157,037.20). These legal expenses are not inclusive of the instant action which is an ongoing legal cost. (See attached summary of legal costs by Middleberg Riddle Group as Exhibit 16)

WHEREFORE, Plaintiff, 6315 Magazine, L.L.C., prays that Defendants, Flot Nola, L.L.C., Cecil Roebuck, Lydia Breighner, RESET, LLC, Buoyance, Inc., International Therapeutic Floatation Conference, LLC, The Float Conference, LLC be cited and after all due proceedings had and all legal delays, there be Judgment in favor of Plaintiff, 6315 Magazine, L.L.C. for any relief that the Court deems appropriate, including but not limited to, damages, costs and attorneys' fees.

**THE MIDDLEBERG RIDDLE GROUP**

Edward J. Rantz, Jr., LA Bar #25220
(Filing Attorney)
erantz@midrid.com
Jean-Paul Morrell, LA Bar #29635
jpmorrell@midrid.com
909 Poydras St., Suite 1400
New Orleans, LA 70112
Telephone: (504) 525-7200

Counsel for Plaintiff, 6315 Magazine, L.L.C.